**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jay Bennett, et al., | No. CV-23-01061-PHX-DGC |
| Plaintiffs, | |
| v. | **PRELIMINARY INJUNCTION** |
| Isagenix International, LLC, | |
| Defendant. | |

Plaintiffs Jay and Siv Bennett and their marketing company ask the Court to enter a preliminary injunction barring Defendant from terminating the parties' relationship and restoring Plaintiffs' privileges as associates and leaders in Defendant's multi-level marketing company. Docs. 2, 27. The Court denied a temporary restraining order ("TRO") on June 20, 2023, and held a preliminary injunction hearing on July 14. Docs. 21, 31. For reasons stated below, the Court will grant a preliminary injunction.

**I.      Legal Standard.**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All four elements must be satisfied. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022).

**II.     Likelihood of Success on the Merits.**[1]

Defendant is a multi-level marketing company that develops and markets products for weight management, long-term wellness, and skincare, promoted by a network of thousands of independent contractors known as "associates." Associates who enroll other associates earn commissions not only on their own sales of Defendant's products but also on sales by the associates they enroll.

Plaintiff Jay Bennett signed a contract with Defendant in 2002. His wife, Plaintiff Siv Bennett, signed a contract in 2016. During the last 20 years Plaintiffs have enrolled hundreds of additional associates. Those associates are now found in Plaintiffs' "downline" and produce substantial income for Plaintiffs – gross earnings of more than $2 million per year since 2016 and more than $20 million during the last 20 years. Ex. 10.[2] Plaintiffs have not produced the contracts signed by Jay Bennet in 2002 or Siv Bennett in 2016, but the parties agree that they were Defendant's Independent Associate Agreement ("IAA") that incorporated Defendant's Policies and Procedures ("P&Ps").

When Plaintiffs signed their original contracts in 2002 and 2016, the P&Ps provided that Defendant could terminate an associate's contract only for cause. *See, e.g.*, Ex. 15 ¶¶ 3.4, 7.1 (2013 version). Defendant revised the P&Ps on March 27, 2017 to provide that Defendant could, without cause, choose not to renew an associate's contract. *See* Ex. 14 ¶ 3.4 ("Isagenix may, at its sole discretion, elect not to renew your Associate Contract."). Defendant amended the IAA in 2020 to provide that "Isagenix may also terminate your [IAA] or Position at any time for any reason." Ex. 27 ¶ 11. Plaintiffs claim that Defendant never informed them of these changes.

On May 25, 2023, Defendant sent Plaintiffs a letter advising them that Defendant "has decided to exercise its discretion, pursuant to Section 3.4 of the P&Ps, not to enter

---

[1] The factual findings and legal conclusions contained in this order are based on evidence and arguments presented in connection with the TRO and preliminary injunction hearings and will not be binding on the parties at later stages of this case or arbitration.

[2] Citations are to exhibits and declarations admitted in evidence for purposes of the preliminary injunction hearing.

2

into a new Associate Contract for [your] positions when they expire on their own terms next month." Ex. 5. The letter did not identify grounds for the non-renewal. *Id.*

Plaintiffs claim that the non-renewal breached the IAAs they signed, which allowed termination only for cause. Doc. 1.[3] Not only did the May 25 letter not specify a cause for termination, but Plaintiffs assert that the entire premise of their decades of labor with Defendant was that Plaintiffs could build a substantial downline and then enjoy years of residual income from that downline, as they have been doing recently. Plaintiffs contend that Defendant's non-renewal without cause is nothing more than a misappropriation of the financial rewards of their hard work.

Citing the language added to ¶ 3.4 of the P&Ps in 2017, Defendant responds that Plaintiffs' contracts – at the time of the non-renewal in 2023 – expressly permitted non-renewal without cause. The Court finds Defendant's arguments unpersuasive.

### A.    Unilateral Amendments.

Defendant contends that Plaintiffs agreed Defendant could unilaterally amend the contract between them: "That Isagenix can amend the P&Ps is also not new: a provision permitting Isagenix to amend the Associate Contract, and expressly requiring Associates agreement to be bound by the most current versions of the P&Ps upon their renewal or acceptance of a commission payment, has existed since at least September 1, 2013." Doc. 19 at 12.[4] In fact, the post-2013 P&Ps did provide that "[b]y becoming an Associate, and each time you receive and accept a commission or bonus payment, you agree to abide by the then most current terms and conditions of the [IAA], the Policies, the Compensation Plan, the applicable Isagenix Guidance Documents, and other applicable policies, agreements or obligations." Ex. 13 ¶ 2.1. Defendant contends that under this and similar provisions Plaintiffs – by renewing their contracts and accepting commissions – agreed to the March 2017 addition of the no-cause termination provision.

---

[3] Plaintiffs assert a variety of other claims, but the Court will focus its analysis on breach of contract. *See id.* ¶¶ 45-50.

[4] Citations to documents in the Court's docket are to page numbers placed at the top of pages by the Court's electronic filing system.

3

The Ninth Circuit has held, however, that one party to a contract cannot make a binding change to the contract without notifying the opposing party of the change and obtaining its assent. "Parties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side. Indeed, a party can't unilaterally change the terms of a contract; it must obtain the other party's consent before doing so." *Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007). This is true even if the contract provides that one side may change the contract from time to time. In *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082 (9th Cir. 2020), the parties' contract – like the post-2013 P&Ps in this case – provided that Experian could change the contract and "[e]ach time" Stover "accessed . . . the . . . Product Website" she would be agreeing to "the then current" terms of the agreement. *Id.* at 1084. Even with such language, the Ninth Circuit held that changes were not binding unless Stover received notice of them:

> Stover assented only once to the terms of a single contract that Experian later modified without providing notice. Just as in *Douglas*, Stover had no obligation to investigate whether Experian issued new terms without providing notice to her that it had done so. . . . We therefore hold that in order for changes in terms to be binding pursuant to a change-of-terms provision in the original contract, both parties to the contract – not just the drafting party – must have notice of the change in contract terms.

*Id.* at 1086.[5]

Defendant agreed at the preliminary injunction hearing that the current record contains no communication from Defendant alerting Plaintiffs to the change in the renewal provisions of the P&Ps or IAA. As a result, the Court concludes that Plaintiffs are likely to succeed in showing that the change is not binding on them, that their contracts could be terminated only for cause, and that non-renewal without cause therefore was a breach.

---

[5] Defendant argues that *Stover* is distinguishable because it involved an unusual fact pattern – the corporate party that unilaterally changed the contract argued that the change did not apply because Stover had not received sufficient notice. *See id.* at 1085. The question decided by *Stover*, however, was the same question presented here: whether a change to terms of a contract, under a change-of-terms provision, is binding when the other party does not receive notice of the change. The Ninth Circuit said no. *Id.* at 1086.

### B. Internet Agreements.

Defendant notes in its preliminary injunction memorandum that the Ninth Circuit has enforced on-line agreements where one party provided the other side with easy access to a proposed agreement (usually in the form of a conspicuous hyper-link to the agreement), clearly stated that the other side would be agreeing to the terms of the agreement if it clicked on a button and proceeded, and the other side then clicked and proceeded. *See, e.g.*, *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515-16 (9th Cir. 2023); *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394-95 (9th Cir. 2020).

Defendant provides evidence that Plaintiffs in this case placed several orders under similar circumstances:

> From March 27, 2017 (i.e., the date Isagenix implemented the non-renewal clause), to May 30, 2020, Isagenix received at least nine manual (not auto-ship) orders via Plaintiffs' five Positions, placed with Plaintiffs' account login, and using an IP address indicating Plaintiffs' known residences in Nevada or California. Each time Plaintiffs placed an order, Isagenix provided conspicuous notice of its P&Ps and each time, Plaintiffs clicked "Place Order."

Doc. 30 at 9-10 (citations omitted).

Defendant is correct that the Ninth Circuit has enforced contracts created in this way, provided "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Oberstein*, 60 F.4th at 515. But these cases concern new contracts – situations where the agreeing party has never seen the contract before and reasonably would be expected to review it before agreeing to be bound. The cases do not concern established contractual relationships where one side changes an existing contract and never notifies the other side. That situation is properly governed by *Douglas* and *Stover* and the fundamental principle that parties to an existing contract "have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." *Douglas*, 495 F.3d at 1066.

5

*Douglas* described the difficulty that would arise if contracts could be changed so easily:

> Nor would a party know *when* to check the website for possible changes to the contract terms without being notified that the contract has been changed and how. Douglas would have had to check the contract every day for possible changes. Without notice, an examination would be fairly cumbersome, as Douglas would have had to compare every word of the posted contract with his existing contract in order to detect whether it had changed.

*Id.* at 1066 n.1.

*Stover* identifies additional concerns:

> [Allowing changes without notice] would lead to absurd results: contract drafters who included a change-of-terms provision would be permitted to bind individuals daily, or even hourly, to subsequent changes in terms. The absence of limits on the frequency or substance of changes in terms subverts the basic rule of contract law that a contract exists where the parties assent to the same thing in the same sense, so that their minds meet.

978 F.3d at 1086 (cleaned up).

The Court is not persuaded that Defendant's unilateral addition of the non-renewal provision, without notice of the change to Plaintiffs, is binding under new-contract cases like *Oberstein* and *Lee*.

**C.   Defendant's Other Arguments.**

Defendant makes other arguments as to why the change is binding, but the Court does not find them persuasive. These include a Facebook notice Defendant sent to Plaintiffs and other associates regarding changes to the IAA's privacy provisions, and an email regarding amendment of a section in the IAA unrelated to the non-renewal provision. Doc. 30 at 10-11. None of these communications notified Plaintiffs of the addition of the non-renewal provision, and without such notice, the change is not a binding part of Plaintiffs' contract. *Douglas*, 495 F.3d at 1066; *Stover*, 978 F.3d at 1086.[6]

---

[6] The parties did not address choice-of-law issues in their briefing, and primarily cited Ninth Circuit cases that apply the laws of other states. Some of the contract issues in this case may ultimately be governed by Arizona law, but at this expedited state of

In summary, the Court concludes that Plaintiffs are likely to succeed in showing that the binding contracts in this case did not include the non-renewal provisions added without notice, and that Plaintiffs' non-renewal without cause therefore constituted a breach.

**III.  Irreparable Harm.**

To support the entry of a preliminary injunction, irreparable harm must be "likely, not just possible." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "[S]peculative injury does not constitute irreparable injury[,]" *Colorado River Indian Tribes v. Parker*, 776 F.2d 846, 849 (9th Cir. 1985), and "[m]ere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation," *Goldie's Bookstore, Inc. v. Super. Ct. of the State of Cal.*, 739 F.2d 466, 471 (9th Cir. 1984).

Plaintiffs assert various categories of irreparable harm and Defendant contests all of them vigorously. The Court finds one category sufficient for injunctive relief and therefore will not address the others.

Plaintiffs present evidence that they will suffer substantial consequential damages if their contracts are terminated, totaling millions of dollars. *See* Dec. E ¶¶ 15-17 (supplemental declaration of Derk Rasmussen); Dec. F (declaration of John Duncan). The P&Ps, however, specifically provide that Plaintiffs cannot recover consequential damages from Defendant. *See* Ex. 1 ¶ 9.7. Defendant confirmed at the preliminary injunction hearing that it intends to seek enforcement of this damages limitation.

The parties have not briefed, and the Court does not decide, whether the damages limitation provision will be enforceable. But at this stage of the litigation it appears likely that Plaintiffs will incur millions in consequential damages they cannot recover. This constitutes irreparable harm. *See Flex-Plan Servs., Inc v. Evolution1, Inc.*, No. C13-1986-JCC, 2013 WL 12092543, at *7 (W.D. Wash. Dec. 31, 2013) ("Even though an injury is

---

preliminary relief the Court has looked to the authorities cited by the parties and relied on cases applying fundamental principles of contract law. The Court notes, however, that Arizona cases require "clear and unequivocal" notice before another document can be incorporated into a contract. *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 420 (Ariz. Ct. App. 1983) (citation omitted). The Court assumes that similarly clear notice is required before a change can be incorporated into a contract.

7

ordinarily insufficient if money damages would make the party whole, Flex-Plan and Evolution1 contractually removed that option in this matter.  The Court accordingly agrees that Evolution1 is likely to suffer harm that, under the plain terms of the contract, cannot be remedied by an award of monetary damages."); *see also Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 176 (S.D.N.Y. 2022) ("the parties' limitation of liability might cut the other way in justifying the need for injunctive relief, because absent preliminary relief, [Bionpharma's] ability to be made whole after a wrongful [breach] would be seriously jeopardized.") (citation omitted)

Defendant cites cases holding that a limitations of damages provision does not show irreparable harm.  *See Phibro Biodigester, LLC v. Murphy-Brown, LLC*, 2022 WL 17243727, at *10 (D. Utah Nov. 23, 2022) ("It would be antithetical to the freedom of contract if courts worked around the parties' bargained-for limitations to grant extraordinary relief in equity based on those same negotiated limitations."); *DataPath, Inc. v. Gen Dynamics SATCOM Techs., Inc.*, 2007 WL 9697777, at *4 (N.D. Ga. Nov. 9, 2007) ("The court will not, through the extraordinary remedy of injunction, provide the plaintiff relief that it waived in entering into the [contract.]").  These cases turn primarily on the fact that the contracts in question were negotiated between sophisticated parties, plus the thought that a sophisticated party who has knowingly negotiated away its right to recover consequential damages cannot later claim that its inability to recover those damages constitutes irreparable harm.  Plaintiffs certainly can be viewed as sophisticated business people, but the evidence at this preliminary stage of the case suggests that Defendant presented its contract terms to them on a take-it-or-leave-it basis.  *See* Ex. 27 ¶ 14 ("If you do not agree with such changes, your only remedy is to terminate your [contract with Defendant]").  Thus, Plaintiffs appear likely to show that they were required to waive their consequential damages – that they were forced by Defendant to forego such recovery and therefore will receive no remedy for millions in damages.  An inability to recover millions in damages constitutes irreparable harm.

/ / /

### IV. Other Factors.

The remaining two factors require only brief discussion. The balance of equities – requiring Defendant to continue its relationship with Plaintiffs, who have been longtime stars within the company, versus requiring Plaintiffs to endure a breach of contract that will cost them millions in consequential damages they likely cannot recover – tips in Plaintiffs' favor. The Court also concludes that preventing a potentially significant breach of contract with millions in damages is in the public interest.

**IT IS ORDERED:**

A. The Court enters this preliminary injunction, effective immediately, to remain in place until this litigation is resolved or the Court orders otherwise:

1. Defendant shall restore Plaintiffs' access to the Back-Office for distributor ID Account Nos. 1119332, 8521558, 9907890, 11432148, 1145915 to allow Plaintiffs to continue operating, supervising, training, and managing their downline business.

2. Defendant shall not dismantle or redistribute the downlines associated with distributor ID Account Nos. 1119332, 8521558, 9907890, 11432148, 1145915 to other Isagenix distributors or third parties unless such changes are necessary for routine business activities and done with Plaintiffs' prior consent.

3. Defendant shall restore Plaintiffs' access to all residual commissions derived from the downlines associated with distributor ID Account Nos. 1119332, 8521558, 9907890, 11432148, 1145915, and such commissions shall be paid to Kesha Marketing, Inc. each month as provided in the Isagenix Compensation Plan.

4. Defendant shall not manipulate or interfere with Plaintiffs' ability to monitor, supervise, train, or operate their downlines associated with distributor ID Account Nos. 1119332, 8521558, 9907890, 11432148, 1145915.

5. Defendant shall not terminate or suspend Plaintiffs' business associated with distributor ID Account Nos. 1119332, 8521558, 9907890, 11432148, 1145915 without cause.

B.   Within **48 hours** of this order, Plaintiffs shall post a bond in the amount of $1,500,000.

C.   Defendant has stated repeatedly that it intends to file a motion to compel arbitration once this preliminary relief issue is resolve.  Defendant shall file the motion by **July 28, 2023**.

Entered July 17, 2023 at 3:25 p.m.

*David G. Campbell*
_____
David G. Campbell
Senior United States District Judge